DAVID C. SHONKA
Acting General Counsel
CHARLES A. HARWOOD
Regional Director
SOPHIA H. CALDERÓN, CA Bar No. 278135
Email: scalderon@ftc.gov
Federal Trade Commission
915 2nd Ave., Suite 2896, Seattle, WA 98174
(206) 220-6350 (phone) / (206) 220-6366 (fax)

LOCAL COUNSEL
KERRY O'BRIEN, CA Bar No. 149264
Email: kobrien@ftc.gov
Federal Trade Commission
901 Market St., Suite 570, San Francisco, CA 94103
(415) 848-5100 (phone) / (415) 848-5184 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>      Plaintiff,<br><br>vs.<br><br>GENIUS TECHNOLOGIES, LLC, a limited liability company;<br>AVANGATEE SERVICES, LLC, a limited liability company; and<br>PARMJIT SINGH BRAR,<br>      Defendants. | No. 3:18-cv-01096<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

COMPLAINT                            1

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101 - 6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c), and (d), and 15 U.S.C. § 53(b).

## INTRADISTRICT ASSIGNMENT

4. Assignment to the San Francisco Division is proper pursuant to Local Rule 3-2(d) because Defendants have provided their services in the County of Alameda.

## PLAINTIFF

5. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

6. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 6102(c), and 6105(b).

## DEFENDANTS

7. Defendant Avangatee Services, LLC ("Avangatee") was a California limited liability company with its principal place of business in Hayward, California. Avangatee was formed in September 2015. It dissolved in December 2016. Avangatee transacts or has transacted business in this district and throughout the United States.

8. Defendant Genius Technologies, LLC ("Genius Technologies") was a California limited liability company with its principal place of business in Hayward, California. Genius Technologies was formed in December 2015. It dissolved in January 2018. Genius Technologies transacts or has transacted business in this district and throughout the United States.

9. Defendant Parmjit Singh Brar ("Brar") was the sole member of Genius Technologies and the sole member of Avangatee. He is or has been the sole signatory to the bank accounts of Genius Technologies and Avangatee, and has identified himself as the "Owner with Control of the Entity" with respect to Avangatee. Monthly statements for Genius Technologies' and Avangatee's bank accounts are or have been addressed to Brar's personal residence. He is the Agent for Service of Process for Genius Technologies. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Genius Technologies and Avangatee, including the acts and practices set forth in this Complaint. Brar resides or has resided in this district and, in connection with

the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

10. Defendants Avangatee and Genius Technologies (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Defendants have conducted the business practices below through interrelated companies that have common ownership, members, and business functions. Because the Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Brar has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise. Collectively, Brar and the Corporate Defendants are referred to hereafter as "Defendants."

## COMMERCE

11. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' UNLAWFUL CONDUCT

12. Beginning in at least 2015, Defendants have provided substantial support and assistance to an Indian tech support scheme in which purported technicians illegally obtain older consumers' personal information without their permission while deceiving those consumers into purchasing phony or otherwise suspect technical support services.

### *The Tech Support Scheme*

13. The tech support telemarketers contact consumers by either cold-calling them and pretending to be representatives of a well-known technology company, or by using pop-up advertisements disguised as security alerts that direct consumers to immediately call a telephone number to protect their computer.

COMPLAINT 4

14. Regardless of the initial method of contact, the scheme proceeds similarly once the telemarketer has the consumer on the phone. Emphasizing the need for immediate action, the telemarketer claims that the consumer's computer is at risk and that the telemarketer can assist the consumer but first needs remote access to the consumer's computer. Once remotely connected, the telemarketer purports to confirm the existence of a serious cyber-threat, sometimes claiming that a hacker will soon be able to access the consumer's personal information, including financial account numbers, social security numbers, and passwords. The telemarketer also sometimes tells the consumer that a hacker is attempting to steal a large sum of money from the consumer's bank account. Imparting a sense of urgency, the telemarketer claims he will install expensive and high-quality network security software to resolve the problem in exchange for a substantial sum of money. The telemarketer frequently represents that the security software is affiliated with the U.S. government. If the consumer agrees to the telemarketer's offer, the telemarketer installs junk software or older versions of security software, such as anti-malware, that are available elsewhere for free or for a fraction of the price quoted to the consumer by the telemarketer.

15. While remotely connected to the consumer's computer, the telemarketer frequently removes copies of the consumer's tax returns and other documents found on the consumer's computer that may contain personal information.

16. After the telemarketer purports to have installed high-quality network security software, he instructs the consumer to pay by mailing a check to a given address. The cost to the consumer ranges between several hundred to tens of thousands of dollars.

17. The consumer then receives subsequent calls from the telemarketers or their associates, during which they concoct new phony reasons why the consumer must purchase additional network security software from the

COMPLAINT 5

telemarketers in order to avoid new cyber-threats.  Several consumers have paid over $50,000; one paid almost $400,000 over the course of several years.

18. Since 2013, consumers have filed well over 500 complaints about the tech support telemarketers on Consumer Sentinel, a consumer complaint database maintained by the FTC.

### *Defendants' Substantial Support and Assistance*

19. The Indian tech support telemarketers contract with individuals and entities in the United States to establish and maintain business accounts on which the scheme depends, facilitate receiving and processing consumers' payments, and provide a general veneer of domestic legitimacy to the scheme.  In 2015, Defendants began providing these services to the tech support telemarketers, and thereby began assisting and facilitating the telemarketers in each step of their scheme.

20. Defendants established and paid for the telephone accounts on which the tech support telemarketers depend in order to conduct their scheme.  Since 2015, Defendants have paid for at least three different telecommunications accounts, providing the telemarketers with over sixty telephone numbers with area codes from around the country by which the telemarketers cold-call consumers.

21. Defendants established and paid for the remote connection accounts through which the telemarketers access consumers' private computers and claim to remedy serious cyber-threats by installing purportedly high-quality network security software.  It is through these remote connection accounts that the tech support telemarketers steal consumers' personal information.

22. Defendants established and paid for the registration, renewal, and hosting of website domains that the tech support telemarketers use to market and legitimize their scheme.  Since 2015, Defendants have paid for the registration of at least 12 different domains used by the tech support telemarketers.

23. Defendants established and paid for the rental mailbox accounts where the tech support telemarketers direct consumers to send their checks. Defendants collected checks from those mailboxes several times a week.

24. Defendants opened and maintained the bank accounts where Defendants deposited consumers' checks. On at least two occasions, consumers wired large payments ($79,998 and $59,998) directly to these accounts. Since 2015, Defendants opened at least six different bank accounts for the purpose of receiving and processing consumers' payments.

25. Several times a week, after depositing the checks into their domestic accounts, Defendants wired substantial sums of money to the tech support telemarketers' various overseas accounts. Since 2015, Defendants have wired millions of dollars to those overseas accounts.

### *Defendants' Knowledge of the Scheme*

26. Since the beginning of their involvement in the tech support scheme, Defendants have known, or have consciously avoided knowing, of the operation's fraudulent practices.

27. In November 2015, Defendants received a letter from Avangate, Inc. ("Avangate"), an e-commerce company that specializes in software, demanding that Defendants cease and desist using the name "Avangatee" because Defendants were offering sham technical support services with the intent to extort money from consumers and Defendants' use of the name "Avangatee" suggested a false association with and sponsorship by Avangate.

28. Shortly thereafter, Defendant Brar replied to Avangate, acknowledging receipt of Avangate's letter and, among other things, promising to stop using the "Avangatee" name within four weeks. Contrary to Brar's promise, Avangatee remained in operation for at least another year.

29. In November 2015, the Better Business Bureau (BBB) serving the San Francisco Bay Area and Northern Coastal California sent Defendants a letter

COMPLAINT 7

informing them that complaints had been filed against their business, and requesting specific information about how Defendants became aware that a consumer's computer was vulnerable, where Defendants were located, and whether Defendants were affiliated with any other entities.  Defendants did not respond.

30. In March 2017, a police officer in Michigan contacted Defendant Brar demanding restitution in the amount of $29,998 for an elderly consumer who had fallen victim to the tech support scheme.  In response to that demand, Defendant Brar complied and sent the consumer a cashier's check for the requested amount.

31. In addition to the notifications they received concerning their involvement in a tech support scam, Defendants repeatedly encountered strong indicia of fraud.  The checks from consumers that Defendants collected and deposited were facially suspect.  On numerous instances, they were for inexplicably exorbitant amounts, especially given the checks' memo line (e.g., $19,998 ("internet repair"); $41,998 ("computer security"); $22,000 ("computer support")).  On numerous instances, Defendants deposited multiple checks evidently written by the same consumer on the same day (e.g., $9,949 and $9,940; $14,999.99 and $13,000; $23,999 and $26,000).  Furthermore, there was tremendous range in the checks' amounts, despite memo lines indicating consumers were purchasing similar services:  "computer service" ($11,996); "computer services" ($65); "internet security" ($7,999); "network security" ($150).

32. As further indicia of fraud, several of the business accounts that Defendants opened to facilitate the scheme were subsequently terminated by the account-provider, including at least four bank accounts.  Defendants responded by opening new accounts elsewhere.

33. Despite notifications of their involvement in a tech support scam, highly suspicious checks, and terminated accounts, Defendants continued to provide material support for the tech support telemarketers.

COMPLAINT                             8

## VIOLATIONS OF THE FTC ACT

34. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

35. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### Unfair Acts or Practices

36. In numerous instances, as described in paragraphs 12 through 33 above, Defendants caused or were likely to cause substantial injury to consumers that consumers could not reasonably avoid themselves and that was not outweighed by countervailing benefits to consumers or competition.

37. Therefore, Defendants' practices as described in Paragraph 36 of this Complaint constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

38. In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108.  The FTC adopted the original TSR in 1995 and extensively amended it in 2003 and 2010.  16 C.F.R. Part 310.

39. Defendants have provided numerous services on behalf of persons who are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

40. It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Section 310.3(a) of the TSR.  16 C.F.R. § 310.3(b).

41. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

42. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

43. The TSR prohibits any seller or telemarketer from making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

44. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Assisting and Facilitating Deceptive Telemarketing Acts and Practices

45. In numerous instances, Defendants have provided substantial assistance or support to sellers or telemarketers whom Defendants knew or consciously avoided knowing induced consumers to pay for goods and services through the use of false or misleading statements, in violation of Section 310.3(a)(2)(iii), (vii), and 310.3(a)(4) of the TSR, as described in Paragraphs 12 through 33 above. 16 C.F.R. § 310.3(a)(2)(iii), (vii), and 310.3(a)(4).

46. Defendants' acts or practices, as described in Paragraph 45 above, are deceptive telemarketing acts or practices that violate Section 310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

47.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

48.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

49.     Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission and reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the

COMPLAINT                                       11

refund of monies paid, the disgorgement of ill-gotten monies, and pre-judgment interest; and

    C.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: _February 21___, 2018     __/s/ Sophia Calderón_____
SOPHIA CALDERÓN

Attorney for Plaintiff
FEDERAL TRADE COMMISSION

COMPLAINT      12